# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**18601 ALDERWOOD MALL PKWY LLC,**

       *Appellant,*

**v.**                                             **Case No. 3:19cv408**

**PROPCO I DEBTORS,** *et. al,*

       *Appellees.*

## MEMORANDUM OPINION

This matter comes before the Court on Appellant 18601 Alderwood Mall Pkwy LLC's ("Alderwood") appeal from the May 22, 2019 Order ("Sale Order") of the Honorable Keith L. Phillips, United States Bankruptcy Court Judge, approving the private sale of a lease over Alderwood's objections. (Bankr. Case No. 18-31429, ECF No. 1.) Propco I Debtors filed a Response Brief,[1] (ECF No. 25), and Alderwood replied, (ECF No. 28). The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Accordingly, the matters are ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 158(a)(1).[2] For the reasons that follow, the Court will affirm the judgment of the Bankruptcy Court.

---

[1] Through an Agreed Order, the Court granted Southwestern Furniture of Wisconsin, LLC ("Southwestern Furniture") leave to intervene as an appellee. (Sept. 18, 2019 Order, ECF No. 21.) Southwestern Furniture, together with Hill Street Properties, LLC, the successor in interest to Propco I Debtors, then filed a joint response brief.

[2] "The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157] . . . ." 28 U.S.C. § 158(a)(1).

## I. Factual and Procedural Background

This appeal primarily concerns the meaning of a commercial lease provision that triggers a significant rent increase when certain conditions are satisfied. On appeal, the Parties ask this Court to resolve: (1) whether statutory mootness bars this dispute; (2) whether the Bankruptcy Court erred in its interpretation of Lease Section 2.03; (3) whether the Bankruptcy Court erred when finding that the rent escalation clause contained in Lease Section 2.03 functions as an anti-assignment clause; and, (4) whether the Bankruptcy Court committed clear error when it did not append a property maintenance report to the Sale Order. To decide the instant appeal, the Court recounts the relevant facts and Lease terms.[3]

### A. Toys "R" Us Enters a Lease for the Premises at 18601 Alderwood Parkway

On May 1, 1981, Toy Property Associates II, acting as landlord, entered an amended and restated lease (the "Lease") with Toys "R" Us, Inc., acting as tenant, for the premises located at 18601 Alderwood Parkway, Lynnwood, Washington.[4] (R. 289–384.) That Lease underlies this appeal. Pursuant to the Lease, the initial rent period between the landlord and the tenant expired on May 31, 2006. (R. 292.) Thereafter, the Lease contemplated that the tenant "shall have the

---

[3] For ease of reference, the Court refers to the following entities in this Memorandum Opinion:

- Toys "R" Us – the original leaseholder
- TRU 2005 RE I, LLC – a Toys "R" Us affiliate and 2005 assignee of the lease
- Propco I Debtors – Debtor Affiliates of Toys "R" Us following 2017 bankruptcy
- Hill Street – Successor in interest to Propco I Debtors
- Southwestern Furniture – the organization that purchased the Lease from Hill Street
- Alderwood – the landlord for 18601 Alderwood Mall Parkway

(*See* R. 545, Supp. R. 234, 237.)

[4] The Lease refers to this property as the "Demised Premises." (R. 291.)

option to renew" the lease for five consecutive five-year renewal periods. (R. 292.) The Lease

further specified that "[e]ach installment of Fixed Rent payable during each Renewal Period,

shall be $23,265, and shall be payable monthly in arrears on the last day of each month during

such period." (R. 380.)

Relevant to this appeal, however, Section 2.03 of the Lease increased the rent owed

during the last four five-year renewal periods if certain conditions were satisfied. (R. 293). In its

entirety, Section 2.03 provided:

> Provided no Event of Default by Tenant then exists, Tenant shall have the option
> to renew this lease for five consecutive five (5) year renewal periods (each such
> period being hereinafter sometimes referred to as a "Renewal Period"),
> commencing at the expiration of the then existing Lease Term, pursuant to all of
> the terms, covenants and conditions of this Lease (except that Tenant shall not
> have the right to renew this Lease beyond the expiration of the fifth (5th) Renewal
> Period and except as set forth in the last sentence of this Section 2.03.). In the
> event that Tenant shall desire to exercise the option or options herein granted,
> Tenant shall so advise Landlord by notice given no later than ten (10) months
> prior to the expiration of the then existing Lease Term. Any final cancellation or
> termination of this Lease shall terminate any right of renewal hereunder. During
> the last four five-year Renewal Periods, *if Tenant, its subsidiaries and affiliates
> are in actual physical occupancy of less than 80% of the Demised Premises and
> an assignment of this Lease or a sublease of all or any part of the Demised
> Premises is then in effect*, the Fixed Rent per annum shall be increased to an
> amount equal to 15% of the Acquisition Cost, payable monthly in arrears.

(R. 292–93 (emphasis added).) If triggered, the final sentence of Section 2.03 would increase the

rent owed from $23,265 per month to fifteen percent of the acquisition cost ($2,585,000), or

nearly $33,000 per month, which represents an increase in the monthly rent of roughly forty

percent. (R 70, 374, 427.)

**B.    Toys "R" Us Assigns the Lease to an Affiliate in 2005 and Files for
          Bankruptcy in 2017**

On November 30, 2005, Toys "R" Us assigned the Lease to TRU 2005 RE I, LLC, "a

Delaware limited liability company, having an address at c/o Toys 'R' Us, One Geoffrey Way,

Wayne, NJ, 07470." (R. 385.) The parties to the assignment did not exchange money for the lease because TRU 2005 RE I, LLC operated as an affiliate of Toys "R" Us. As reflected in the assignment, "[t]his Instrument is a conveyance with no change in beneficial interest." (R. 385.)

On September 11, 2017, Toys "R" Us, Inc. and certain of its affiliates filed for Chapter 11 bankruptcy. Through the bankruptcy process, Toys "R" Us and its affiliates "commenced these [bankruptcy] cases to resolve issues with landlords and manage their properties in a unified forum, maximizing the value of their estates for the benefit of all stakeholders." (Supp. R. 13.) Such efforts included monetizing leasehold interests, such as the Lease at issue. (*Id.*) To that end, on October 16, 2018, Propco I Debtors ("Propco") filed pursuant to 11 U.S.C. § 365(f) a "Notice of Assumption" regarding the unexpired Lease for 18601 Alderwood Mall Pkwy LLC, asserting that Propco would assume the unexpired Lease. (R. 24.) Propco further asserted that that the amount to cure all defaults presently existing under the Lease totaled zero dollars. (*Id.*)

Alderwood objected to the Notice of Assumption. (R. 24–31.) Specifically, Alderwood asserted that there existed "numerous uncured and continuing defaults under the Lease" for which it deserved compensation. (R. 25–29.) Alderwood asserted that one such default began in July 2018, when the tenant, Propco, vacated the premises, triggering the rent increase in Section 2.03. (R. 27, 73.) Alderwood claimed that at that point "[t]he Propco I Debtors [were failing] to pay the increased rental amount and associated interest resulting from their less than 80% occupancy of the Premises beginning no later than July 27, 2018." (R. 27.) Because "[t]he Propco I Debtors [were] not an operating entity and [were] not moving to assign the Lease," Alderwood assumed that the "Propco I Debtors [were] seeking to [takeover] the lease presumably so that they can later assign it to some yet to be identified user." (R. 26.)

4

At the same time, while the Bankruptcy action proceeded, Alderwood helped drive up the purchase price for the Lease by submitting its own bids for it. (R. 406–07.) Initially, Southwestern Furniture agreed to purchase the Lease from Propco for $500,000, though Southwestern Furniture would increase the amount to purchase the Lease by $175,000 if the Bankruptcy Court voided Section 2.03. (R. 56–65.) Southwestern Furniture later increased its bid to $1.5 million, or $1.325 million if the Bankruptcy Court elected not to strike Section 2.03 as an unenforceable anti-assignment clause. (R. 406.) Hill Street, the successor in interest to Propco,[5] eventually selected Southwestern Furniture as the purchaser of the Lease, rather than Alderwood. (R. 407.)

## C.    The Toys "R" Us Debtors Move to Sell the Lease to Southwestern Furniture

Shortly after Alderwood filed its objection to the Notice of Assignment, Propco—the holder of the Lease—moved the Bankruptcy Court to enter an order approving the private sale of the Lease free and clear of liens, claims, and encumbrances. (R. 32–65.) Such an order would allow Propco (and later, Hill Street,) to sell their Lease interest to Southwestern Furniture.

Alderwood objected to Propco's motion, raising many of the same arguments that it raised in its objection to the Notice of Assignment. (R. 66–86.) Although Alderwood made "clear at the outset [that] it [did] not object to any assignment of the Lease," it argued that the proposed sale sought to change the "economic terms of the lease under the guise of § 365(f)(1) and that the premises needed many repairs to cure breaches of the Lease before the sale." (R. 69–74.) Alderwood again asserted that when Propco vacated the premises on July 27, 2018, that move triggered the rent increase in Section 2.03. (R. 73.) Specifically, Alderwood argued

---

[5] Hill Street became the successor in interest to the Propco I Debtors pursuant to and for the limited purposes set forth in the Fourth Amended Joint Chapter 11 Plan of Toys "R" Us Property Company I, LLC and its Debtor Affiliates. (R. 545 n.3.) The Bankruptcy Court generally referred to Propco and Hill Street collectively as the Debtors.

that "[a]ll conditions of Section 2.03 of the Lease were met thereby returning the Fixed Rent to the amounts in effect prior to the Renewal Period, beginning in July 2018 and through the expiration of the Lease." (R. 73.) Because of Section 2.03, Alderwood contended that the "successful purchaser of the Leasehold interest [must] pay fixed monthly rent equal to 15% of the Acquisition Cost, payable monthly in arrears." (R. 74.) To counter concerns about Section 2.03 functioning as an anti-assignment clause, Alderwood claimed that "Section 2.03 was included in the Lease as part of the implementation of the overall tax shelter and was a legitimate economic term for the benefit of the counterparty to the tax shelter structure; not a provision designed to impact or restrict future assignments of the Lease." (R. 73.)

### D.   The Bankruptcy Court Holds Two Hearings Regarding the Sale of the Lease

On April 8, 2019, the Bankruptcy Court held a hearing on the motion, and the Parties proceeded to address "four primary issues:" (1) the scope of the maintenance and repair issues; (2) whether Southwestern Furniture constituted a shell company; (3) whether Section 2.03 of the Least was triggered and whether that section represented an "unenforceable anti-assignment provision;" and, (4) whether Hill Street, then the successor-in-interest to Propco, had properly declined a bid for the Lease from Alderwood. (R. 201.) The issues concerning Section 2.03 and the disputed maintenance and repairs—the first and third issues—are central to this appeal.

Regarding maintenance and repairs, Counsel for Alderwood pointed to an expert's report attached to a proposed order to help explain the needed repairs. (R. 197.) Counsel then explained that Alderwood did not bring their expert to the hearing to discuss the repairs because "[Hill Street] said [they] will make all the repairs that are in this report." (R. 197.) In response, Counsel for Hill Street stated that "the attachment of this report to our proposed order was in no way an agreement" and that "we are resolved on the scope of repairs." (R. 198.) The

6

Bankruptcy Court then summarized the repair issue by saying that "the debtor [Hill Street] says they'll do what the lease says they got to do. And the assignee [Southwestern Furniture] will do what the lease says they got to do." (R. 198–99.) The Parties proceeded to other matters.

The Bankruptcy Court then heard witness testimony regarding Hill Street's motion for an order approving the private sale of the Lease free and clear of liens, claims, and encumbrances. (R. 201–57.) After hearing certain witness testimony related to the motion, the Bankruptcy Court continued the hearing to a later date due to time constraints. (R. 256.)

On May 1, 2019, the Bankruptcy Court resumed the hearing regarding Hill Street's motion for an order that would allow it to assume and assign the Lease to Southwestern Furniture. (R. 400.) Regarding Section 2.03, Counsel for Hill Street, as successor-in-interest to Propco, argued that that Lease provision is triggered "if two things happen. One, Toys 'R' Us and its subsidiaries and affiliates are in actual possession of less than eighty percent of the [premises]; and, two, that there's an assignment of the lease of substantially all of the [premises]." (R. 466.) Counsel explained that "if both of those triggers are met [then] there's a significant jump in the rent" from "about $23,000 [per month] to $32,000 [per month]." (*Id.*) But, according to Counsel for Hill Street, "the plain language is that if the tenant's subsidiaries and affiliates are holding the lease, and that it's in physical actual capacity, that the [Section 2.03] test has not been met." (*Id.*) Because Toys "R" Us transferred the Lease to an affiliate in 2005, Counsel for Hill Street asserted that the assignment did not trigger Section 2.03. (R. 467.)

Additionally, Counsel for Hill Street claimed that Section 2.03 "was initially included as part of a tax shelter, in an effort to try and ensure that the tax shelter was not destroyed by having Toys 'R' Us or one of its affiliated entities owning less than eighty percent of the property." (R. 467.) Counsel for Hill Street asserted that Section 2.03 would "only get triggered when the

transfer to [Southwestern Furniture] is closed." (R. 468.) Then, upon transfer to Southwestern Furniture, the rent increase would be triggered "[a]nd that's why [Hill Street] think[s] it's an unenforceable anti-assignment provision." (*Id.*) Because the "uncontroverted evidence is that prior to the assignment, . . . the rent will be . . . $23,265" and "then the rent will jump to almost 33,000 dollars . . . that change is just the type of modification that Section 363(f)(3) is intended to prohibit." (*Id.*) Counsel for Hill Street further explained that "Southwestern Furniture has agreed to amend the . . . assignment agreement to increase the price paid for the assignment to 1.5 million dollars or 1.325 million dollars if Your Honor determines that Section 2.03 of the lease agreement is an enforceable provision and not an anti-assignment provision." (R. 400–01.)

Counsel for Hill Street continued by saying that they wanted to sell the Lease to Southwestern Furniture rather than Alderwood because they "made an agreement with [Southwestern Furniture], and [Hill Street] want[ed] to stick to that agreement. [Hill Street] also feel[s] that we'd get exposed – or we have some reputational risk by declining this deal. So [Hill Street] decided to maintain [Southwestern Furniture's] revised offer." (R. 407.)

In response, Counsel for Alderwood stated that the Bankruptcy Court need only reach the "tax issues" if that court found the Lease provision ambiguous. (R. 495.) The Bankruptcy Court observed, however, that the parties did not introduce evidence to contradict the plain language of the Lease. (R. 495.)

Counsel for Alderwood contended that Section 2.03 contained a "two-prong trigger." (R. 497.) The two prongs included (1) that the "tenant, its subsidiaries and affiliates" occupy less than eighty percent of the premises; and, (2) an assignment of the lease or sublease "is then in effect." (R. 293, 497.) Regarding the first prong, Counsel for Alderwood asserted that the parties had agreed that the tenant, its subsidiaries, or affiliates were "not in physical occupancy

8

of eighty percent" of the premises. (R. 497.) Thus, the first prong had been satisfied. (*Id.*)

According to Counsel for Alderwood, the issue was "really [whether] there [had] been an

assignment of this lease." (*Id.*) Looking to the "four corners of the document," Counsel for

Alderwood argued that the 2005 assignment from Toys "R" Us to TRU 2005 RE I, LLC,

triggered the second prong of the two-prong trigger. (R. 498.)

In closing, Counsel for Alderwood asked the Bankruptcy Court to sustain their "objection

and direct the debtors [Hill Street] to sell the property to [Alderwood] for 1.5 million." (R. 504.)

Alternatively, Counsel for Alderwood asked the Bankruptcy Court to "overrule, in part,

[Hill Street's] motion, to the extent it tries to argue that section 2.03 is an anti-[assignment]

clause." (R. 504–05.)

### E.     The Bankruptcy Court Approves the Private Sale of the Lease

After hearing closing remarks from both sides, the Bankruptcy Court announced from the

bench that "an assignment to an affiliate . . . is not something that triggers" Section 2.03.

(R. 516.) As such, the Bankruptcy Court found that "the [increased] rent for the stub period [was

not] owed as a result of this provision because [the court did not] find that the assignment to the

affiliate [was] intended to have been an assignment for purposes of this provision." (*Id.*)

Next, the Bankruptcy Court found that "it's uncontroverted – or parties don't disagree –

that the assignment, in the context of the sale or the assignment to Southwest[ern] Furniture,

would trigger this provision and that it does result in an increase in the rent." (*Id.*) The

Bankruptcy Court further observed that the "amount that's being offered by Southwest[ern]

Furniture" reflects that increase. (*Id.*) As a result, the Bankruptcy Court concluded "that

this triggers provisions of Section 365(f)(3) in that it is an anti-assignment provision for those reasons."[6] (R. 516–17.)

The Bankruptcy Court memorialized its decision in a written order issued on May 22, 2019, "approving the private sale free and clear of liens, claims, encumbrances and interests and granting related relief." (R. 544.) The Bankruptcy Court expressly found that the transfer in 2005 to TRU 2005 RE I, an affiliate of Toys "R" Us, did not constitute a transfer within the meaning of Section 2.03, meaning that the rent would increase upon assigning the Lease to Southwestern Furniture:

> Section 2.03 of the Lease is a tax shelter provision that was intended to protect the Landlord's tax shelter. The Landlord's tax shelter is preserved under applicable tax law provided Toys 'R' Us, Inc., its affiliates, or its subsidiaries continue to actually occupy at least 80% of the leased premises or, even absent actual physical occupancy, if they hold the leasehold interest without a sublease or assignment to a third party in place. Section 2.03 of the Lease has not been triggered as of the date of this Order because, at the time of the transfer of the Lease from Toys 'R' Us, Inc. to TRU 2005 RE I, LLC, TRU 2005 RE I, LLC was an affiliate of Toys 'R' Us, Inc. Therefore, the transfer the Landlord referenced as the triggering transfer was not a transfer within the meaning of Section 2.03. See 26 U.S.C. § 1502; 26 U.S.C. § 1504 (defining "affiliated group" and referencing an affiliated group's ability to file consolidated tax returns). Because, section 2.03 has not been triggered, no stub rent is owed on account of a rent increase pursuant to section 2.03
>
> The proposed assignment of the Lease to the Assignee would trigger the rent increase pursuant to section 2.03 upon closing of the transfer. This rent increase is unenforceable as an anti-assignment clause under section 365(f) of the Bankruptcy Code.

(R. 546–47).

The Bankruptcy Court also addressed the required repairs and maintenance. To that end, the Bankruptcy Court found that the "required repairs and maintenance noted by the Landlord on

---

[6] As discussed in detail later, Section 365(f) of the Bankruptcy Code allows trustees to assign contracts or leases to assist a debtor in rehabilitation notwithstanding any contractual provision prohibiting or restricting the assignment of the lease. *See* 11 U.S.C. § 365, *In re Trak Auto Corp.*, 367 F.3d 237, 242 (4th Cir. 2004).

the record during the April 8, 2019 and May 1, 2019 hearings (other than the replacement of the roof-top HVAC units), to the extent required by the Lease, shall be completed within 180 days of the later of such date the Assignor has vacated the Premises or the Closing Date," subject to certain exceptions. (R. 549.)

Finally, the Bankruptcy Court ordered that any rent increase resulting from Section 2.03 would be unenforceable as an anti-assignment clause:

> For the avoidance of doubt, the last sentence of Section 2.03 of the Lease shall be deemed an unenforceable anti-assignment provision pursuant to 11 U.S.C. § 365(f) of the Bankruptcy Code and shall have no effect on Fixed Rent payable under the Lease as a result of the assignment arising under the Assumption and Assignment Agreement or any prior assignment, including but not limited to the assignment by an affiliated party to Assignor.

(R. 550–51.) The Bankruptcy Court therefore approved Hill Street's assumption and sale of the Lease to Southwestern Furniture. (R. 547.) The following day, on May 23, 2019, Alderwood appealed the Sale Order. (ECF No. 1.)

**F.      This Court Denies Alderwood's Motion for Stay Pending Appeal**

Alderwood promptly filed a motion for stay pending appeal, (the "Motion for Stay"), (ECF No. 2), and requested expedited briefing, (the "Motion to Expedite"), (ECF No. 4). In the Motion for Stay, Alderwood argued that it sought a stay pending appeal because, without a stay, Hill Street "will proceed to sell the Lease to Southwestern Furniture of Wisconsin, LLC and Southwestern will immediately begin altering the leased premises to a format" applicable only as a furniture store. (Mot. Stay 2, ECF No. 2.) Alderwood asserted that it may suffer harm because monetary damages for such alterations were "theoretical at best." (*Id.*) Alderwood offered to "standby [sic] its offer to purchase the Lease for $1.5M and waive all claims against the Debtor and post a bond to secure same plus the amount of the Debtor's rental obligation pending the Appeal." (*Id.*)

After reviewing both motions, along with the record, the Court concluded that Alderwood did not establish that the Court must stay the Sale Order pending appeal because Alderwood had not shown: (1) its likelihood of prevailing on the merits; (2) that it would suffer irreparable harm absent a stay; (3) that the equities tipped in its favor; or, (4) that granting the stay served the public interest. (June 4, 2019 Order, ECF No. 9.) This Court denied the Motion to Stay and the Motion to Expedite. (*Id.*)

On August 7, 2019, Southwestern Furniture moved to intervene in this appeal because Hill Street had assigned its interest in the Lease to Southwestern Furniture. (ECF No. 15.) The Parties ultimately submitted an agreed order, which the Court approved, granting Southwestern Furniture leave to intervene as an intervenor/appellee. (Sept. 18, 2019 Order, ECF No. 21.) On August 30, 2019, Alderwood filed its opening brief. Hill Street and Southwestern Furniture filed a response. Alderwood replied. The Court turns now to the merits of this appeal.

## II. Standard of Review

Final orders of a bankruptcy court are appealable to a district court pursuant to 28 U.S.C. § 158(a). "When reviewing a decision of the bankruptcy court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *Webb v. Reserve Life Ins. (In re Webb)*, 954 F.2d 1102, 1103–04 (5th Cir. 1992)). The district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *Stancill v. Harford Sands, Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 639 (4th Cir. 2004). A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United*

12

*States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord Educ. Credit Mgmt. Corp. v. Mosko* (*In re Mosko*), 515 F.3d 319, 324 (4th Cir. 2008) (quoting *United States Gypsum Co.*, 333 U.S. at 395). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996). "Decisions committed to the discretion of the bankruptcy court are reviewed for abuse of discretion." *In re Mitrano*, 409 B.R. 812, 815 (E.D. Va. 2009).

### III. Analysis

To resolve the instant appeal, the Court first examines statutory mootness before turning to Section 2.03 of the Lease, which the Bankruptcy Court correctly concluded constitutes a prohibited anti-assignment clause. Lastly, the Court considers whether the Bankruptcy Court committed clear error when it did not append a property maintenance report to the Sale Order. Finding no reversible error, the Court will affirm the Bankruptcy Court.

A. **Statutory Mootness Prohibits this Court from Modifying the Terms of the Sale Order**

Statutory mootness prohibits this Court from modifying the terms of an order permitting a sale to a good faith purchaser such as Southwestern Furniture. To the extent Alderwood seeks to modify the terms of the Sale Order, the Court cannot change the terms of that order on appeal.

The Bankruptcy Code provides that this Court's reversal or modification of a sale or lease of property will have no effect unless "such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). "That provision moots any challenge to a § 363 sale that 'affect[s] the validity of [the] sale' so long as 'the purchaser acted in good faith and the appellant failed to

obtain a stay of the sale.'" *In re ICL Holding Co., Inc.*, 802 F.3d 547, 553 (3d Cir. 2015)

(quoting 3 Collier on Bankruptcy ¶ 363.11 (16th ed. 2013)).  In its entirety, subsection (m) reads:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

"[A] stay keeps the disputed property within the jurisdiction of the bankruptcy court, and

it forestalls the transactional complexities that arise if the sale to a third party is completed prior

to a final resolution of the claim." *In re Rare Earth Minerals*, 445 F.3d 359, 363 (4th Cir. 2006)

(internal citation omitted).  As a result, § 363(m) "curtails the power of appellate courts to undo

the authorized sale of estate assets to a good faith purchaser unless the sale has been stayed

pending appeal." *Id.* at 361.  Otherwise, the appeal becomes statutorily moot.  *Id.*

The Court finds statutory mootness applicable here.[7]  After the Bankruptcy Court entered

the Sale Order, Hill Street sold its interest in the Lease to a good faith purchaser, Southwestern

Furniture.  Alderwood did not obtain a stay of the Sale Order pending appeal because, after

weighing the requisite factors, this Court did not grant a stay.  (ECF No. 9.)  Absent a stay, this

---

[7] Because the Court finds statutory mootness applicable, it does not evaluate this appeal
under the doctrine of equitable mootness.  The United States Court of Appeals for the Fourth
Circuit has instructed that equitable mootness may arise in the bankruptcy context.  Unlike
constitutional mootness, which bars consideration of appeals because no Article III case or
controversy remains, "the doctrine of equitable mootness is a pragmatic principle, grounded in
the notion that, with the passage of time after a judgment in equity and implementation of that
judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable."
*Mac Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002).  "Applied principally in
bankruptcy proceedings because of the equitable nature of bankruptcy judgments," parties may
invoke equitable mootness "when it becomes impractical and imprudent 'to upset the plan of
reorganization at this late date.'" *Mac Panel Co.*, 283 F.3d at 625 (quoting *In re UNR Indus.,
Inc.*, 20 F.3d 766, 769 (7th Cir. 1994)).

Court cannot "grant effective relief" by modifying the Sale Order. *In re ICL Holding Co.*, 802 F.3d at 554. Thus, "[a]s a preliminary matter, the Court cannot now revisit any issues in the Bankruptcy Court's decision that would modify the terms of the lease as-applied to the Lease's good faith purchaser because there was no stay pending appeal." (Appellee's Br. 7, ECF No. 25.) To the extent Alderwood challenges the Bankruptcy Court's conclusions in the Sale Order regarding Section 2.03 and the sale of the Lease to Southwestern Furniture, this Court cannot modify those terms. 11 U.S.C. § 363(m).

Alderwood argues, however, that § 363(m) does not preclude this appeal because Alderwood "does not seek to modify the terms of the Lease or invalidate the Sale Order." (Reply Br. 2, ECF No. 28.) Alderwood "has accepted [Southwestern Furniture] as its tenant." (*Id.*) Rather, Alderwood asserts that it brings "a targeted appeal in which it seeks the rent it is entitled to under the Lease." (*Id.*) To address Alderwood's claim that it brings a targeted appeal outside the bounds of statutory mootness, the Court turns now to the Bankruptcy Court's decisions regarding the rent owed pursuant to Section 2.03 of the Lease.

**B.     The Bankruptcy Court Did Not Err When Analyzing Section 2.03**

The Bankruptcy Court did not err when it determined that (1) "Section 2.03 of the Lease has not been triggered as of the date of this Order because, at the time of the transfer of the Lease from Toys 'R' Us, Inc. to TRU 2005 RE I, LLC, TRU 2005 RE I, LLC was an affiliate of Toys 'R' Us, Inc.;" and, (2) that "the last sentence of Section 2.03 of the Lease shall be deemed an unenforceable anti-assignment provision pursuant to 11 U.S.C. § 365(f) of the Bankruptcy Code." (R. 546–47, 551).

1.     **Legal Standard: Contract Interpretation Under Washington Law**

The Parties agree that, as set forth in the Lease, Washington state law governs the Lease terms. (R. 365, 370.) Pursuant to Washington law, a court determines the meaning of commercial lease provisions using contract interpretation rules. *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990). Washington follows the "objective theory" of contracts, under which the court must determine the parties' intent by examining the objective terms of the agreement, rather than focusing on the parties' subjective intents. *Hearst Commc'ns, Inc. v. Seattle Times, Co.*, 115 P.3d 262, 267 (Wash. 2005). In doing so, courts must aim "to carry out the intent of the parties as manifested . . . by the parties' own contract language." *Dep't of Corr. v. Fluor Daniel, Inc.*, 161 P.3d 372, 377 (Wash. 2007) (en banc). This standard of review requires courts to give the words of a contract "their ordinary, usual, and popular meaning, unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* Furthermore, courts must presume that contracting parties intend that each part of a contract have some meaning and, if possible, will reject interpretations that render contractual language meaningless. *Pub. Util. Dist. No. 1 of Lewis Cty. v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1209 (Wash. 1985) (en banc).

In addition to the objective theory of contracts, Washington law utilizes the "context rule" to aid courts in determining the intent of the parties to a contract. *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 597 (Wash. 1996). Under that rule, a court may admit extrinsic evidence "to assist the court in ascertaining the intent of the parties and in interpreting the contract . . . regardless of whether or not the contract language is deemed ambiguous." *Id.* (internal citations omitted). Nonetheless, "[u]nilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Id.*

Additionally, the well established parol evidence rule applies where, as here, an agreement is fully integrated—*i.e.*, contains all terms of the parties' agreement. *Berg*, 801 P.2d at 230; (*see* R. 366 (integrating all Lease terms).) Under the parol evidence rule, extrinsic evidence may not be used to "add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake." *Berg*, 801 P.2d at 230.

### 2. The Transfer of the Lease to an Affiliate Did Not Trigger Section 2.03

Turning first to the plain language of the Lease, as the Court must pursuant to Washington law, the Bankruptcy Court correctly found that the 2005 assignment to an affiliate did not trigger the rent increase Section 2.03.

Here, Section 2.03 states that

> During the last four five-year Renewal Periods, *if Tenant, its subsidiaries and affiliates are in actual physical occupancy of less than 80% of the Demised Premises and an assignment of this Lease or a sublease of all or any part of the Demised Premises is then in effect*, the Fixed Rent per annum shall be increased to an amount equal to 15% of the Acquisition Cost, payable monthly in arrears.

(R. 292–93 (emphasis added).) The Bankruptcy Court's conclusion that an assignment to an affiliate did not trigger Section 2.03 comports with the Lease terms regarding the "Tenant, its subsidiaries and affiliates." (R. 293.) As a result, when Propco vacated the premises in 2008, such action did not trigger the rent increase under Section 2.03.

Alderwood argues, however, that the Bankruptcy Court erred because Section 2.03 "contains no express exclusion for affiliate assignments." (Appellant's Br. 31.) But the plain language of Section 2.03 provides that when the tenant, its *"subsidiaries and affiliates"* occupy the premises, that occupancy does not trigger a rent increase. Accordingly, when Toys "R" Us transferred its Lease in 2005 for no monetary consideration to TRU 2005 RE I, LLC, an affiliate

of the company, "the tenant, its subsidiaries and affiliates" continued occupying the premises. Considering Section 2.03's plain language, Alderwood's argument concerning affiliate assignments lacks merit.

Alderwood also challenges the Bankruptcy Court's consideration of "extrinsic evidence under Washington law to interpret the meaning of Section 2.03." (Appellant's Br. 33.) Alderwood asserts that any argument that the parties raised regarding the tax purpose behind Section 2.03 inappropriately "masquerad[es] as evidence." (*Id.* 31.) As such, Alderwood argues that "the [B]ankruptcy [C]ourt erred to the extent it adopted [Hill Street's] tax shelter arguments and used those arguments to modify or contradict the express language of Section 2.03." (*Id.* 32.) The Court concludes this argument similarly lacks merit.

The record shows that that Bankruptcy Court did not require extrinsic evidence to reach the conclusion that an assignment to an affiliate did not trigger the rent increase, as the language in Section 2.03 concerning "subsidiaries and affiliates" makes this result evident. Moreover, in Alderwood's objection to Propco's motion for an order of sale, Alderwood itself raised the argument that the original parties to the Lease included Section 2.03 for tax purposes. (R. 73.) Alderwood made this argument to rebut the contention that Section 2.03 constituted an unenforceable anti-assignment clause in the Bankruptcy context. (*Id.*) Alderwood may not now reverse its position to salvage its interests on appeal.

In any event, the Bankruptcy Court, consistent with Washington law, could consider the claim that the Lease included Section 2.03 for tax purposes, a contention that both Parties raised in the proceedings before the Bankruptcy Court. To that end, the Bankruptcy Court cited applicable provisions of the Tax Code concerning affiliates—objective extrinsic evidence—

rather than mere evidence of the parties' subjective thoughts on the matter when drafting the Lease, which the context rule does not allow.

In sum, the Bankruptcy Court did not err when it found that the 2005 assignment to an affiliate of the tenant, Toys "R" Us, did not trigger the rent increase in Section 2.03 based on the plain language of the Lease and the Parties' assertion that the Lease included that provision for tax purposes. In reaching this conclusion, the Bankruptcy Court appropriately considered the language of Section 2.03 and the tax rationale behind that provision, raised by both Parties, and found that the parties to the Lease would not have intended the 2005 assignment from Toys "R" Us to TRU 2005 RE I, LLC, an affiliate of Toys "R" Us, to trigger the rent increase in Section 2.03. The Court turns next to whether Section 2.03 amounts to an unenforceable anti-assignment provision.

### 3.  Legal Standard:  The Bankruptcy Code Restricts the Enforcement of Anti-Assignment Provisions

Section 365 of the Bankruptcy Code applies when a debtor assigns or sells an unexpired lease of real property during bankruptcy proceedings.[8]  11 U.S.C. § 365.  This section of the

---

[8]  In relevant part, Section 365(f) states:

(f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
  (2) The trustee may assign an executory contract or unexpired lease of the debtor only if--
      (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
      (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.
  (3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a

19

Code, added as part of the Bankruptcy Reform Act of 1978, voids certain contract and lease

provisions to "assist[] a debtor in its rehabilitation or liquidation effort." *In re David Orgell,*

*Inc.*, 117 B.R. 574, 576 (Bankr. C.D. Cal. 1990) (citing H. R. Rep. No. 595, 95th Cong., 1st Sess.

349 (1977)).  As a result, the Bankruptcy Code "prohibits the enforcement in bankruptcy of anti-

assignment clauses in leases." *In re Trak Auto Corp.*, 367 F.3d 237, 242 (4th Cir. 2004).  Put

differently, in the Bankruptcy context, trustees may assign contracts or leases notwithstanding

any provision that "prohibits, restricts, or conditions the assignment of such contract or lease."

11 U.S.C. § 365(f)(1).

In addition to voiding express anti-assignment clauses, certain lease provisions are so

restrictive that courts, in their discretion, classify them as anti-assignment provisions. *In re E-Z*

*Serve Convenience Stores, Inc.*, 289 B.R. 45, 50 (M.D.N.C. 2003).  To determine whether lease

terms function as anti-assignment provisions, courts "look beyond the literal wording of a

contractual provision to see whether it operates as a de facto anti-assignment clause in violation

of § 365(f)." *In re Crow Winthrop Operating P'ship*, 241 F.3d 1121, 1124 (9th Cir. 2001); *In re*

*U.L. Radio Corp.*, 19 B.R. 537, 543 (Bankr. S.D.N.Y. 1982) ("Any lease provision, not merely

one entitled 'anti-assignment clause' [remains] subject to the court's scrutiny regarding its anti-

assignment effect.").

---

party other than the debtor to terminate or modify, such contract or lease or a right
or obligation under such contract or lease on account of an assignment of such
contract or lease, such contract, lease, right, or obligation may not be terminated
or modified under such provision because of the assumption or assignment of
such contract or lease by the trustee.

11 U.S.C. § 365.

Additionally, § 365(f)(3) prohibits the termination or modification of a "contract, lease, right, or obligation . . . because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

### 4.    Section 2.03 Constitutes an Unenforceable Anti-Assignment Provision

The Bankruptcy Court did not err when concluding that Section 2.03 offended 11 U.S.C. § 365(f) because that provision restricted the ability to assign the Lease. Because the Bankruptcy Court found that an assignment and sale of the Lease to Southwestern Furniture would trigger Section 2.03, raising the rent by roughly forty percent, from $23,000 per month to nearly $33,000 per month, the Bankruptcy Court correctly concluded that Section 2.03 functioned as an anti-assignment clause in violation of § 365(f). (R. 428, 550–51.)

Alderwood contends that the Bankruptcy Court erred because Section 2.03 "is not an express anti-assignment provision because it does not prohibit or restrict [Hill Street's] ability to assign its interest in the Lease; the Lease is freely assignable." (Appellant's Br. 37.) Alderwood points to different buyers negotiating to purchase the Lease to support its contention that Section 2.03 did not amount to an anti-assignment clause. (*Id.* 39–40.) Alderwood also claims that "Section 2.03 is not a *de facto* anti-assignment clause or a provision that terminates or modifies the Lease because of the assignment to [Southwestern Furniture] within the meaning of § 365(f)(3)." (*Id.*)

The Bankruptcy Court did not err when it determined that Section 2.03 constitutes an unenforceable anti-assignment clause because, if enforced, that provision would increase the amount of monthly rent owed upon assignment of the Lease to Southwestern Furniture. Simply put, monthly rent is an obligation under the Lease. Enforcing Section 2.03 as to Southwestern Furniture increases that obligation. As a result, because applying Section 2.03 would modify the

21

obligations under the Lease, the Bankruptcy Court did not err when it concluded that the provision violates 11. U.S.C. § 365(f)(3).

The negotiations surrounding the purchase of the Lease do not compel a different result. The record shows that Alderwood helped drive up the purchase price of the Lease shortly before the hearings in the Bankruptcy Court regarding the sale of the Lease. (R. 406–07.) The potential for increased rent factored into Southwestern Furniture's decision-making process, and the Bankruptcy Court heard testimony that this could stymie efforts to move the Sale of the Lease forward. (R. 227.) Because Section 2.03 could directly bar the assignment of the Lease and payment of increased monthly rent could severely hamper the debtor's rehabilitation effort, § 365 governs and precludes enforcement of the increased rent terms in Section 2.03.

## C.     The Bankruptcy Court Did Not Err When it Did Not Append a Property Maintenance Report to the Sale Order

The Bankruptcy Court did not err or abuse its discretion when it did not append a property maintenance report to the Sale Order.

Alderwood asserts that the Bankruptcy Court erred when it did not append a property report to the Sale Order, but the Court finds this argument unavailing for two reasons. First, to the extent Alderwood seeks to change the terms of the Sale Order and the obligations of Southwestern Furniture, a good faith purchaser, statutory mootness bars the Court from doing so on appeal. *See, e.g.*, *6711 Glen Burnie Retail, LLC v. Toys "R" Us, Inc.*, No. 3:18-CV-491-JAG, 2018 WL 6787942, at *2 (E.D. Va. Dec. 26, 2018) ("the assignment of a lease for a valuable consideration is a sale of property to which § 363(m) applies") (citation omitted).

Second, the record belies Alderwood's claim that "[a]ll parties understood that the Property Report was to be part of the record and no evidence was needed to support it." (Appellant's Br. 41.) While Alderwood mentioned that the parties had been discussing the

22

possibility of appending the property maintenance report to the Sale Order, no express agreement to do so appears on the record. (R. 198.) As recounted at the April 8, 2019 hearing, Counsel for Hill Street stated that "the attachment of this [property maintenance] report to our proposed order was in no way an agreement." (*Id.*) He further asserted that the Parties "are resolved on the scope of repairs." (*Id.*) The Bankruptcy Court then summarized the repair issue by saying that "the debtor [Hill Street] says they'll do what the lease says they got to do. And the assignee [Southwestern Furniture] will do what the lease says they got to do." (R. 199.) Alderwood had the opportunity at the May 1, 2019 hearing to again raise this issue to the Bankruptcy Court or present evidence regarding the extent of the repairs, but it choose not to do so. As a result, this Court sees no basis for reversing the Bankruptcy Court on this ground.

## IV. Conclusion

For the foregoing reasons, the Court will affirm the judgment of the Bankruptcy Court. An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: March 4, 2020
Richmond, Virginia